FILED
United States Court of Appeals
Tenth Circuit

August 29, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

FORNEY INDUSTRIES, INC., a Colorado corporation,

      Plaintiff - Appellant,

v.

DACO OF MISSOURI, INC., a Missouri corporation, d/b/a KDAR Company,

      Defendant - Appellee.

No. 15-1226

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:14-CV-01326-CMA-MEH)**
_____

Christopher Benson, Austin, Texas (William W. Cochran, Cochran Freund & Young, Fort Collins, Colorado, with him on the briefs), for Plaintiff-Appellant.

Jack D. Robinson, Spies, Powers & Robinson, P.C., Denver, Colorado, for Defendant-Appellee.
_____

Before **HARTZ**, **EBEL**, and **MORITZ**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Plaintiff Forney Industries, Inc. (Forney) manufactures and sells a variety of

products. Its largest product line is retail metalworking parts and accessories. The issue

in this case is whether the use of colors in its packaging of that product line is a protected

mark under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

Forney's packaging has, since at least 1989, used some combination of red,

yellow, black, and white coloration.  It describes the mark it seeks to protect as follows:

> The Forney Color Mark is a combination and arrangement of colors defined by a
> red into yellow background with a black banner/header that includes white letters.
> More specifically, the Forney Color Mark includes red and yellow as the dominate
> [sic] background colors. Red typically starts at the bottom of the packaging,
> continues up the packaging and may form borders.  Red may also be used in
> accents including but not limited to lettering.  Yellow typically begins higher than
> the red and continues up the packaging.  Yellow may also provide borders and be
> used in accents including but not limited to lettering.  A black banner is positioned
> toward the top of the package label or backer card.  Black may also be used in
> accents including but not limited to lettering.  White is used in lettering and
> accents.

It has also provided five pictures of its packaging over the years, reproduced below with

Forney's caption for each:

2

**Fig. 1:  1991**



**Fig. 2:  1993**



**Fig. 3:  1999**



**Fig. 4:  2002 or Before**



3

**Fig. 5: 2006 or Before**



Aplt. Br. at 7–8.

Forney alleges that Defendant Daco of Missouri, Inc., which does business as KDAR Co. (KDAR), infringed on its protected mark by packaging KDAR's "Hot Max" products with similar colors and a flame motif. Forney offered examples of KDAR packaging compared to that of the competing Forney product, some of which are reproduced below:

**Fig. 6: KDAR Packaging Comparison**    **Fig. 7: KDAR Packaging Comparison**




Aplee. App. Vol. I at 21, 23.

The district court granted summary judgment to KDAR and we affirm. Forney's use of color, which was not associated with any particular shape, pattern, or design, was not adequately defined to be inherently distinctive, and Forney failed to produce sufficient evidence that its use of color in its line of products had acquired secondary meaning (that is, that the relevant public understood those colors to identify Forney as the source).

## I.    Legal Background

Passed in 1946 in an effort to prevent unfair competition in interstate commerce, the Lanham Act contains "an unusual, and extraordinarily helpful, detailed statement of the statute's purposes." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389 (2014) (internal quotation marks omitted). That statement says:

> The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C. § 1127.

The Act's protection "embrace[s] not just word marks, such as 'Nike,' and symbol marks, such as Nike's 'swoosh' symbol, but also 'trade dress,'" *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000). We have defined *trade dress* as "an object's total image and overall appearance, [which] may include features such as size, shape,

5

color or color combinations, texture, graphics, or even particular sales techniques." [1]

*Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1146 (10th Cir. 2016) (internal quotation marks omitted).

The Lanham Act provides trademark protection under two separate sections. First, under § 2 of the Act, 15 U.S.C. § 1052, a party can seek protection of its trademark by registering it with the United States Patent and Trademark Office. *See Wal-Mart Stores*, 529 U.S. at 209. This "entitles the owner to a presumption that its mark is valid." *Id*. "But the failure to register a [mark] does not preclude its protectability." *Savant Homes*, 809 F.3d. at 1147. Unregistered marks are protected from infringement under § 43(a) of the Act, 15 U.S.C. § 1125. *See Savant Homes*, 809 F.3d. at 1147.

To make out a claim under § 43(a) for an unregistered mark, the plaintiff must prove: (1) "[the] identifying mark . . . is inherently distinctive or . . . has acquired distinctiveness through secondary meaning," (2) the mark is nonfunctional, and (3) the competitor's alleged violation of the plaintiff's rights in its mark is likely to cause consumer confusion. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992); *see Savant Homes*, 809 F.3d. at 1147 ("To obtain relief under § 43(a), a plaintiff must show: (1) The trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional." (internal

---

[1] Forney's complaint refers to its mark as a "Color Mark," *e.g*., Aplee. App. Vol. I at 3, while the district court described the claim as one for "trade dress infringement," Order at 14, Aplee. App. Vol. VI at 541. On appeal Forney says the choice between the two terms "is immaterial." Reply Br. At 23. We think "trade dress" is the more descriptive term here, but agree with Forney that the choice of terms does not affect the analysis.

quotation marks omitted)). As here, proving the first element is often the greatest hurdle. A mark is "inherently distinctive if its intrinsic nature serves to identify a particular source. Such [marks] almost *automatically* tell a customer that they refer to a brand and immediately signal a brand or a product source." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 977 (10th Cir. 2002) (citations and internal quotation marks omitted). If the mark is not inherently distinctive, it can gain protection only once "it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Wal-Mart Stores,* 529 U.S. at 211 (brackets and internal quotation marks omitted).

The law relating to whether a trademark is inherently distinctive is more developed for word marks than it is for trade dress. Courts have generally adopted the framework laid out in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976), which separates word marks into five categories to assist in determining whether a mark is inherently distinctive: (1) fanciful, (2) arbitrary, (3) suggestive, (4) descriptive, or (5) generic. *See id.* at 9–11 & n.12. For instance, "Kodak" is an example of a "fanciful" mark because it was "invented solely for [its] use as [a] trademark[]." *Id.* at 11 n.12; *see Wal-Mart Stores*, 529 U.S. at 210. "Camel" cigarettes is an example of an "arbitrary" mark since it is a "common word . . . applied in an unfamiliar way." *Abercrombie & Fitch Co.*, 537 F.2d at 11 n.12; *see Wal-Mart Stores*, 529 U.S. at 210. And "Tide" laundry detergent might be said to be "suggestive," because even though it relates to the type of product at issue, "it requires imagination, thought and perception to

7

reach a conclusion as to the nature of goods." *Abercrombie & Fitch Co.*, 537 F.2d at 11 (internal quotation marks omitted); *see Wal-Mart Stores*, 529 U.S. at 210. These three types of mark, "because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Two Pesos*, 505 U.S. at 768. In contrast, "descriptive" marks—those that "forthwith convey[] an immediate idea of the ingredients, qualities or characteristics of the goods," *Abercrombie & Fitch Co.*, 537 F.2d at 11 (internal quotation marks omitted); *see Wal-Mart Stores*, 529 U.S. at 213 (giving "Tasty" bread and "Georgia" peaches as examples)—are not inherently distinctive, and therefore require proof of secondary meaning to be protected. *See Two Pesos*, 505 U.S. at 769. Finally, words like "spoon" when used in connection with a spoon or "bowl" when used in connection with a bowl are "generic," because they "refer . . . to the genus of which the particular product is a species." *Abercrombie & Fitch Co.*, 537 F.2d at 9; *see id.* at 10 n.11. Generic marks are not protectable under the Lanham Act. *See Two Pesos*, 505 U.S. at 768.

Whether a product's trade dress is inherently distinctive is not as straightforward. At one time the courts of appeals split on whether trade dress could *ever* be inherently distinctive. *See Two Pesos*, 505 U.S. at 767. That split was resolved in *Two Pesos*, where the Supreme Court held that a product's trade dress, like other forms of trademark, could be protected under the Lanham Act by showing that it was inherently distinctive. *See id.* at 773–74. But courts have struggled to come up with a test. *See generally* 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:13 (4th ed.) (McCarthy). Some have appropriated the *Abercrombie* framework, s*ee id.,* and this court

8

gives it careful consideration.[2]   But because that framework was designed for word

marks, it is not surprising that it can be difficult to translate in the trade-dress context.

*See Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1323

n.13 (11th Cir. 2012); *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 243

(5th Cir. 2010) ("Both the Supreme Court and scholars have questioned the applicability

of the *Abercrombie* test to marks other than words."); 1 McCarthy, *supra,* § 8:13 ("Courts

have had considerable difficulty in trying to apply to trade dress the traditional spectrum

of marks categories which were created for word marks—the *Abercrombie* test. . . .  The

problem is that the *Abercrombie* spectrum was specifically developed for word marks and

does not translate into the world of shapes and designs."); *cf. Wal-Mart Stores*, 529 U.S.

at 210–13 (stating that *Abercrombie* test has been applied "[i]n the context of word

marks," and not attempting to apply it to trade dress).  Therefore, it may be useful to

supplement that test with the test first introduced in *Seabrook Foods, Inc. v. Bar-Well*

*Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A. 1977).  That court identified several factors to

consider in determining whether a trade dress is inherently distinctive, including (1)

"whether it was a 'common' basic shape or design," (2) "whether it was unique or

unusual in a particular field," and (3) "whether it was a mere refinement of a commonly-

adopted and well-known form of ornamentation for a particular class of goods viewed by

---

[2] Although this circuit has recited the *Abercrombie* categories in trade-dress cases, *see Sally Beauty Co.*, 304 F.3d at 977 ("Like trademarks, the inherent distinctiveness of a trade dress is categorized along the generic-descriptive-suggestive-arbitrary-fanciful spectrum."); *Savant Homes*, 809 F.3d at 1147 ("Trade dress, like trademarks, are classified in the following categories of generally increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful."), we have not mandated exclusive use of that framework.

the public as a dress or ornamentation for the goods."[3]  *Id.*; *cf. Wal-Mart Stores*, 529 U.S.

at 214 (quoting these *Seabrook* factors but noting that the test could "rarely provide the

basis for summary disposition").

Although the Supreme Court has held that trade dress can be inherently

distinctive, it has given little guidance on what is required.  It has never adopted one of

the above tests for inherently distinctive trade dress.  *See* 1 McCarthy, *supra*, § 8:13

("The Supreme Court [in *Wal-Mart Stores*] did not require use of the *Abercrombie* test

for classifying packaging trade dress as either inherently distinctive or not.").  The only

time the Court has upheld a lower court's ruling that a trade dress was inherently

distinctive was in *Two Pesos*, where it gave the following description of the trade dress

for a chain of Mexican restaurants:

> a festive eating atmosphere having interior dining and patio areas decorated with
> artifacts, bright colors, paintings and murals. The patio includes interior and
> exterior areas with the interior patio capable of being sealed off from the outside
> patio by overhead garage doors. The stepped exterior of the building is a festive
> and vivid color scheme using top border paint and neon stripes. Bright awnings
> and umbrellas continue the theme.

505 U.S. at 765.  But the Court's opinion contained no analysis of what were the key

elements establishing inherent distinctiveness or even whether it agreed that the trade

dress in that case was inherently distinctive.  *See id.* at 770 (whether the trade dress was

---

[3] The *Seabrook* court listed a fourth factor:  "whether [the design] was capable of creating
a commercial impression distinct from the accompanying words."  568 F.2d at 1344.  We
do not consider this factor because it does not relate to whether the trade dress is
inherently distinctive, but instead "to a different question: is the design really a separately
registerable mark apart from any nearby words."  1 McCarthy, *supra*, § 8:13 n.9; *cf. Wal-Mart Stores*, 529 U.S. at 214 (listing only first three *Seabrook* factors).

inherently distinctive "is [not] before us").  The sole issue before the Court was whether

trade dress could *ever* be inherently distinctive.  *See id.* at 773–76.

The Supreme Court has been more definitive in saying what kind of trade dress

*cannot* be inherently distinctive.  Since *Two Pesos*, the Court has twice carved out certain

types of trade dress that by their nature could not be inherently distinctive and would

therefore be protected only upon proof of secondary meaning.  First, in *Qualitex Co. v.*

*Jacobson Products Co.*, 514 U.S. 159 (1995), the Court considered whether the green-

gold color of dry-cleaning press pads was entitled to protection under the Lanham Act.

*See id.* at 161.  Resolving a circuit split, the Court held that the Lanham Act "permits the

registration of a trademark that consists, purely and simply, of a color."  *Id*. at 160–61.  It

said that "a product's color is unlike 'fanciful,' 'arbitrary,' or 'suggestive' words or

designs, which almost automatically tell a customer that they refer to a brand," *id*. at 162–

63, but it could see no reason why a product's color should not be protected *if it had*

*acquired secondary meaning*.  *See id.* at 163–66.  Although, as Forney points out, the

color at issue was the product's color, not the color of a package, nothing in the opinion

suggests that the distinction matters.

Then in *Wal-Mart* the Court held that a product's design could not be inherently

distinctive.  529 U.S. at 212.  In doing so the Court reaffirmed that "color[] is not

inherently distinctive" (again making no distinction between color on a package or color

of the product).  *Id.*  It explained, "The attribution of inherent distinctiveness to certain

categories of word marks and product packaging derives from the fact that the very

purpose of attaching a particular word to a product, or encasing it in a distinctive

11

packaging, is most often to identify the source of the product." *Id*. But "[i]n the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist." *Id*. at 213. Most notably for our purposes, the Court emphasized the need for clear rules about what can be inherently distinctive:

> Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness. How easy it is to mount a plausible suit depends, of course, upon the clarity of the test for inherent distinctiveness, and where product design is concerned we have little confidence that a reasonably clear test can be devised.

*Id.*; *see id.* at 214 ("Competition is deterred . . . not merely by successful suit but by the plausible threat of successful suit . . . ."). And the Court expressed "little confidence" that courts could articulate a clear test for inherently distinctive product design. *See id.* at 213–14. In particular, addressing the government's proposed use of the *Seabrook* test as applied to product design, it said that "[s]uch a test would rarely provide the basis for summary disposition of an anticompetitive strike suit." *Id*. at 214. "[G]iven the unlikelihood of inherently source-identifying design," the Court said, "the game of allowing suit based upon alleged inherent distinctiveness seems to us not worth the candle." *Id.* There would be little loss to the values protected by the Lanham Act, because there are other avenues available to protect truly unique designs before secondary meaning has attached—"the producer can ordinarily obtain protection for a design that is inherently source identifying (if any such exists), but that does not yet have secondary meaning, by securing a design patent or a copyright for the design." *Id*. Finally, acknowledging that there may be close cases (such as a classic Coca-Cola bottle)

12

where courts will have "to draw difficult lines between product-design and product-packaging trade dress," the Court instructed lower courts to "err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." *Id.* at 215. "The very closeness will suggest the existence of relatively small utility in adopting an inherent-distinctiveness principle, and relatively great consumer benefit in requiring a demonstration of secondary meaning." *Id.*

In light of the Supreme Court's directive that a product's color cannot be inherently distinctive and its concern that inherent distinctiveness not be the subject of excessive litigation, we hold that the use of color in product packaging can be inherently distinctive (so that it is unnecessary to show secondary meaning) only if specific colors are used in combination with a well-defined shape, pattern, or other distinctive design. A review of the pertinent case law, both before and after *Wal-Mart*, indicates that our view is consistent with the practice of other courts.

We have found several cases in which color was a component of trade dress determined to be inherently distinctive. In each case, however, the color was used in combination with a shape, pattern, or other distinctive design. In *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 584 (2d Cir. 1993), the Second Circuit held that the packaging of a bottle of liqueur (No. 12 Ouzo) was inherently distinctive. The packaging consisted of a "clear glass bottle with a large label on its side and a second, smaller label on its neck." *Id.* at 581. The larger label had a white background outside a rectangle with a red bottom half and a white top half. *See id.* "No. 12" was written in black block lettering on the top half, with a small "No" and a large

"12," "made to resemble a stencilled number on a crate or barrel." *Id.* "Ouzo" was printed in white block lettering on the bottom half. *Id.* The small label on the neck "mirror[ed] the large label in layout, except that a circle [was] used in place of the rectangle." *Id.* The court acknowledged that "[t]rade dresses often utilize commonly used lettering styles, geometric shapes, or colors, or incorporate descriptive elements," but said that that does not prevent the packaging from being inherently distinctive as a whole. *Id.* at 584. "While each of these elements individually would not be inherently distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness." *Id*.

Similarly in *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1536 (11th Cir. 1986), the Eleventh Circuit affirmed a district court's finding that the packaging of a Klondike Bar was inherently distinctive. As in *Paddington*, the trade dress involved much more than just color. The packaging was square and brightly colored, had a pebbled texture, displayed images of a polar bear and a sunburst, and used a distinctive style of printing. *See id*. at 1536. "Both the polar bear and the sunburst [were] outlined and highlighted with royal blue. Below the bear [was] the word 'Klondike,' written in large white letters outlined in royal blue." *Id.* at 1533. The Eleventh Circuit rejected the argument that the packaging could not be inherently distinctive because some of the components (silver foil, color blue, sun, polar bear) just connote cold, which is not distinctive when used for ice-cream products. And it rejected arguments that competitors had used various elements of the Klondike bar in their packaging. It explained, "Isolated or piecemeal third party uses of various elements of the Klondike trade dress do not detract from the

14

distinctiveness of the overall impression conveyed by the combination of those elements on the Klondike wrapper." *Id.* at 1537. Looking to the entire design of the packaging, the court held that the district court's finding of inherently distinctive trade dress was not clearly erroneous and therefore the Klondike Bar packaging was protectable without any showing of secondary meaning. *See id.*

In *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 696 (5th Cir. 1981), the Fifth Circuit was presented with a trade-dress claim based on the packaging of "Ortho" lawn and garden products made by Chevron. The packaging had a precise template that designated the locations of each color, set the size and positioning of the lettering, and included a distinctive Chevron mark. The bottle was dark with a yellow cap. *Id.* at 697. The labelling's background was "composed of three horizontal bands of color; the top 20% [was] white, the next 30% [was] yellow, and the bottom 50% [was] red." *Id.* "ORTHO" was printed "on the white band in bold black letters, along with the distinctive chevron mark of the Chevron companies." *Id.* And on the label the product name, warnings, and other information uniformly appeared on specific bands. *See id.* The Fifth Circuit held that this combination of design elements was protectable without any showing of secondary meaning, saying:

> Ortho could not preempt the use of red and yellow nor does it seek to do so. It seeks only to protect the combination of particular hues of these colors, arranged in *certain geometric designs*, presented in conjunction with a particular style of printing, in such fashion that, taken together, they create a distinctive visual impression.

*Id.* at 703 (emphasis added).

15

So too in *McNeil Nutritionals, LLC v. Heartland Sweeteners LLC*, 566 F. Supp. 2d 378, 389 (E.D. Pa. 2008), where a district court held that the packaging of Splenda artificial sweetener was inherently distinctive. The Splenda packaging used a yellow, blue, and white color scheme. *See id.* at 390. But the trade dress was more than just color, and included a "combination of pictorial elements, colors, labeling, and layout (including the prominent placement of the product name surrounded by a distinctive white cloud)." *Id.* at 389. Parrying an objection that Splenda's trade dress could not be inherently distinctive because several of the elements, including the color scheme, were merely descriptive of the product or common in the industry, the court stated that it must "look at the overall combination of the pictorial elements and the other non-pictorial elements of the Splenda trade dress, such as the lettering styles, colors and layout of the Splenda packaging." *Id.* In light of the overall combination of elements, the court held that the packaging "identif[ies] the products as originating with the makers of Splenda," and was therefore inherently distinctive. *Id.*

Finally, in *Letica Corp. v. Sweetheart Cup Co.*, 805 F. Supp. 482, 484 (E.D. Mich. 1992), a district court was presented with a trade-dress claim for the design on disposable drinking cups. The bottom half of the cup was a solid "light brownish-gray" color. *Id.* at 485. "Just above this solid-colored, bottom half of the cup [was] a small band of the same brownish-gray color approximately four-tenths of an inch in thickness." *Id.* And "four-tenths of an inch above this smaller gray band [was] a burgundy band approximately one-tenth of an inch in thickness." *Id.* at 485–86. Finally, "[r]ising out of this thin burgundy band [was] an art-deco style double-leaf pattern that appear[ed]

16

recurrently around the circumference of the cup." *Id.* at 486. The court held that evidence of secondary meaning was unnecessary because the trade dress was "sufficiently fanciful to present a genuine issue as to whether defendant's design is inherently distinctive." *Id.* at 487–88. As the court aptly put it, "While the combination of two colors by itself may not be distinctive, a color combination used in conjunction with a *particular geometric pattern* can be a valid trademark." *Id.* at 489 (emphasis added).

None of these cases support the proposition that a color scheme or palette, in and of itself, can be inherently distinctive. Each looked to color in association with shapes and other patterns or designs.

In contrast, when courts have considered a color scheme or palette in isolation, the analysis has turned on whether the plaintiff has proved secondary meaning. In *Board of Supervisors for Louisiana State University Agricultural and Mechanical. College. v. Smack Apparel Co.*, 550 F.3d 465, 471 (5th Cir. 2008), the Fifth Circuit considered whether the color schemes for several universities were protected under the Lanham Act. The court did not address inherent distinctiveness, agreeing with the parties "that a color scheme can be protected as a trademark when it has acquired secondary meaning and is non-functional." *Id.* at 475. Ruling that the universities had established secondary meaning, the court held that the universities' color schemes were protectable trade dresses. *See id.* at 477; *see also Univ. of Kansas v. Sinks*, 644 F. Supp. 2d 1287, 1295, 1297–98 (D. Kan. 2008) (analyzing University of Kansas color scheme for secondary meaning only because "[c]olors can never be inherently distinctive; they are only

17

protectable if they have acquired secondary meaning"). Similarly, in *Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2015 WL 1543262, at \*11 (N.D. Ill. Mar. 31, 2015), the district court dealt with a claim that "a yellow and black color combination" on power tools and packaging qualified for protection as trade dress. It focused only on secondary meaning, because "[a] color combination is not inherently distinctive but may have secondary meaning." *Id*. at 27 (citing *Qualitex*, 514 U.S. at 163). And in *Deere & Co. v. MTD Holdings Inc.*, No. 00 CIV. 5936 (LMM), 2003 WL 22439778 (S.D.N.Y. Oct. 28, 2003), the district court rejected a claim of inherently distinctive trade dress for "Deere's Green and Yellow trademarks and Deere's Green and Yellow Trade Dress as applied to its lawn and garden equipment in a specific and arbitrary manner, namely a green body or frame with yellow trim." *Id.* at \*2 (internal quotation marks omitted). The court held that the mark was "still simply a combination of colors, which the Supreme Court has held can never be inherently distinctive." *Id.*

Leading secondary authorities seem to agree. McCarthy on Trademarks and Unfair Competition says, "After the *Qualitex* decision, whether color is confined to a defined design can determine whether inherent distinctiveness is a possible alternative to proving secondary meaning." 1 McCarthy, *supra*, § 7:45; *cf.* Restatement (Third) of Unfair Competition § 13 cmt. d at 108 (1995) (stating before *Qualitex*, "Color can be protected as an element of a trademark *when used as part of a design, pattern, or combination of colors* that as a whole is inherently distinctive or has acquired secondary meaning." (emphasis added)).

II.     **Forney's Case**

18

We turn now to Forney's case. Forney brought this action in the United States District Court for the District of Colorado claiming that packaging of KDAR's products infringed on Forney's trade dress under the Lanham Act and violated Colorado law. KDAR counterclaimed that Forney was infringing on KDAR's color mark, although in its summary-judgment pleadings it clarified that the counterclaim was to be considered only if the court found a likelihood of confusion between the parties' marks. The district court granted KDAR's motion for summary judgment on Forney's Lanham Act claims, dismissed KDAR's counterclaims as moot, and declined to exercise supplemental jurisdiction over Forney's state-law claims. Citing *Qualitex* and *Wal-Mart*, the district court held that Forney's mark could not be inherently distinctive because "the use of particular colors qualifies for protection only upon a showing of so-called 'secondary,' or acquired meaning." Aplee. App. Vol. VI at 546. It then held that Forney offered insufficient proof of secondary meaning to withstand summary judgment. Forney appeals both holdings.

"We review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied." *Merrifield v. Bd. of Cnty. Comm'rs for Cnty. of Santa Fe*, 654 F.3d 1073, 1077 (10th Cir. 2011) (internal quotation marks omitted). In doing so, "[w]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Id.* (internal quotation marks omitted). We will affirm a grant of summary judgment if "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

19

## A. Inherent Distinctiveness

Our examination of Forney's argument that its trade dress is inherently distinctive

begins with Forney's description of the packaging for its product line. In its brief to us,

Forney defines its trade dress as follows:

> The Forney Color Mark is a combination and arrangement of colors defined by a red into yellow background with a black banner/header that includes white letters. More specifically, the Forney Color Mark includes red and yellow as the dominate [sic] background colors. Red typically starts at the bottom of the packaging, continues up the packaging and may form borders. Red may also be used in accents including but not limited to lettering. Yellow typically begins higher than the red and continues up the packaging. Yellow may also provide borders and be used in accents including but not limited to lettering. A black banner is positioned toward the top of the package label or backer card. Black may also be used in accents including but not limited to lettering. White is used in lettering and accents.

Aplt. Br. at 6 (record citations omitted). A substantially identical description was given

in district court through an affidavit by Forney President and Chief Executive Officer

(CEO) Steven Anderson.[4]

We question whether this description would satisfy the articulation requirement

for a protectable mark. Several courts have adopted a requirement that a plaintiff seeking

---

[4] The affidavit says:

> The "Forney Color Mark" is defined by a red into yellow background with a black banner/header that includes white letters. As set forth in our response to Daco's Interrogatory No. 1 we identifies [sic] the Forney Color Mark as: Red and yellow have been and continue to be the dominate [sic] background colors. Red typically starts at the bottom of the packaging, continues up the packaging and may form borders. Red may also be used in accents including but not limited to lettering. Yellow typically begins higher than the red and continues up the packaging. Yellow may also provide borders and be used in accents including but not limited to lettering. A black banner is positioned toward the top of the package label or backer card. Black may also be used in accents including but not limited to lettering. White is used in lettering and accents.

Aplee. App. Vol. V at 464–65.

to protect its unregistered trade dress do more than just point to the "overall look" of its trade dress; it must "articulat[e] the specific elements which comprise its distinct dress." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997); *see also, e.g.*, *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014) ("[I]t is the plaintiff's duty to articulate the specific elements which comprise its distinct dress." (brackets and internal quotation marks omitted)); *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 415 (6th Cir. 2006) ("It will not do to solely identify in litigation a combination as 'the trade dress.'  Rather, the discrete elements which make up that combination should be separated out and identified in a list." (brackets and internal quotation marks omitted)).  When the alleged trade dress appears on products that are not identical, courts have required the plaintiff to go further: "[A] plaintiff asserting that a trade dress protects an entire line of different products must articulate the *specific common elements* sought to be protected." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 118 (2d Cir. 2001) (emphasis added).  There are several reasons for not protecting a vaguely defined trade dress.  To begin with, "[w]ithout . . . a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market." *Landscape Forms*, 113 F.3d at 381.  Similarly, if descriptions are vague, "jurors viewing the same line of products may conceive the trade dress in terms of different elements and features, so that the verdict may be based on inconsistent findings." *Yurman Design*, 262 F.3d at 117.  Also, "[c]ourts will . . . be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves

21

protection." *Landscape Forms*, 113 F.3d at 381.  "And if a court is unable to identify what types of designs will infringe a trade dress, how is a competitor . . . to know what *new* designs would be subject to challenge by [the trademark holder]?"  *Yurman Design*, 262 F.3d at 117.

In any event, Forney's description is too vague to satisfy our requirement that the color scheme be used in combination with a well-defined shape, pattern, or other distinctive design.  For example, Forney says that the yellow "typically" begins higher than red.  Lettering and accents "may" be red, yellow, white, or black.  This failure in the description cannot be blamed on any shortcoming in counsel's power of expression.  It is probably the best that one could do, given the variety of packaging that Forney has used on its products over the years.  What once was packaging consisting of a bright-yellow oval surrounded by a red background topped by black and yellow bars with yellow and black lettering, *see* Fig. 1, eventually became a red-fade-into-yellow-fade-into-red background with a black bar and white lettering, *see* Fig. 4, and finally ended up as a yellow-fade-into-red background with a black bar and white lettering, *see* Fig. 5.

In short, Forney has used the combination of red, yellow, white, and black in such diverse ways that there is no consistent shape, pattern, or design we can discern from its description of its mark or from the examples it provides.  Particularly in light of the Supreme Court's instruction to be cautious about applying vague, litigation-friendly tests for inherent distinctiveness, we conclude that Forney has failed to establish an inherently distinctive trade dress.

**B.**     *Secondary Meaning*

We therefore turn to the evidence of secondary meaning. Trade dress is said to have developed secondary meaning "when in the minds of the public, the primary significance of the mark is to identify the source of the product rather than the product itself." *Wal-Mart Stores*, 529 U.S. at 211 (brackets and internal quotation marks omitted). Forney has the burden of persuasion on the issue. *See Savant Homes*, 809 F.3d at 1150 ("Because Savant failed to raise a fact issue as to inherent distinctiveness or secondary meaning, it failed to satisfy its summary judgment burden on its trade dress claim."); *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir. 1990) ("The existence of secondary meaning is a question of fact with the burden of proof on the party claiming exclusive rights in the designation."). Secondary meaning can be established through "direct evidence, such as consumer surveys or testimony from consumers." *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004) (internal quotation marks omitted). But a plaintiff can also rely on circumstantial evidence, such as:

> (1) the length and manner of the trade dress's use; (2) the nature and extent of advertising and promotion of the trade dress; (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the trade dress and a particular product or venture; (4) actual consumer confusion; (5) proof of intentional copying; or (6) evidence of sales volume.

*Savant Homes*, 809 F.3d at 1148 (citations omitted).

Forney does not point to any direct evidence of secondary meaning but does list three items from an affidavit by CEO Steven Anderson that it argues meet its burden:

> 1. Forney's extensive promotional and advertising efforts at more than 10,000 stores that featured products bearing the Forney Color Mark in Forney Displays over each of the past 25 years;

23

2. Forney has over half a billion dollars in sales of over 4,000 different products bearing the Forney Color Mark over the past 25 years from the Forney Displays; and

3. Forney Displays provide a constant connection between the Forney Color Mark and Forney as the source of the products.

Aplt. Br. at 31.

We agree that advertising can be strongly probative. For instance, in *In re Owens-Corning Fiberglas Corp.*, 774 F.2d 1116 (Fed. Cir. 1985), one of the preeminent trade-dress-color cases, the court looked to advertising that highlighted the pink color of the product. *See id.* at 1126–27. Owens-Corning had used the Pink Panther in commercials that told consumers that they "can cut the high cost of fuel if they would only '[a]dd another layer of pink' in their attics." *Id.* at 1126. And it had slogans in its advertising such as: "Pink of Perfection"; "The Pink Cooler"; "Big Pink"; "Love that Pink"; "Pink Power"; "America's Favorite Pink Product"; "Tickled Pink"; "Put your House in the Pink"; "Up with Pink"; "Prime Time Pink"; "Think Pink"; "Think More Pink"; "Beat the Cold with Pink"; "All that Pink"; and "Plant Some Pink Insulation in your Attic." *Id.* at 1126–27. The court said that "this broad promotion of 'pink' in association with [Owens-Corning's] fibrous glass residential insulation is of evidentiary value." *Id.* at 1127.

But advertising alone is typically unhelpful to prove secondary meaning when it is not directed at highlighting the trade dress. *See* 1 McCarthy, *supra*, § 8:8 ("[S]econdary meaning cannot usually be proven by advertising that merely pictures the claimed trade dress and does nothing to emphasize it or call attention to it."); *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009) ("To demonstrate secondary

24

meaning based on advertising, the advertising must be of a nature and extent to create an association [of the trade dress] with the advertiser's goods." (internal quotation marks omitted)). And here the district court found that Forney's advertising "utterly fails to mention the Color Mark, or to emphasize it in any fashion." Aplee. App. Vol. VI at 550. On appeal Forney does nothing to challenge that characterization or otherwise show how the advertising was directed at highlighting its trade dress.

Forney's evidence of sales data is similarly unavailing. It provides total sales volume but gives no indication of how those sales relate to the color mark. *See Savant Homes*, 809 F.3d at 1148 ("Sales volume . . . only suggests secondary meaning when presented in conjunction with other evidence; standing alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification." (brackets and internal quotation marks omitted)); *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1154–55 (10th Cir. 2013) ("Evidence that its products had millions of users and that its products were sold through well-known retailers does not tell us whether the sales were stimulated by the mark.").

Finally, Forney points to CEO Anderson's testimony that Forney was the exclusive user of the trade dress for 20 years. True, exclusive use of a trade dress over a great length of time may support a finding of secondary meaning. But Forney has failed to make a sufficient showing of exclusive use to survive summary judgment. First, Anderson's statements are conclusory. *See L&M Enterprises, Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000) ("Unsupported conclusory allegations . . . do not create a genuine issue of fact."); *Gimix, Inc. v. JS & A Grp., Inc.*, 699 F.2d 901, 907

25

(7th Cir. 1983) (affidavit alleging that trademark was well-known was "conclusory in nature and did not adequately place the question of secondary meaning to consumers in issue"). Anderson does not even clearly assert that Forney's use of color was unique, stating merely that "Forney's extensive promotion, advertising and sales of Forney Retail Metalworking products bearing the Forney Color Mark were uncontested, extensive and exclusive for 20 years," Aplee. App. Vol. V at 470, and providing pictures of four packages from its "primary" competitors that use different colors, Aplt. Br. at 12. The limited probativeness of those four examples is demonstrated by several pictures offered by KDAR showing product packages in the retail-metalworking sector that bear a close resemblance to Forney's product packaging.[5]

More decisively, Anderson's assertion of exclusive use is undermined by the same flaw that doomed Forney's inherently-distinctive arguments. "To acquire secondary meaning, a trade dress must have been used so long and so exclusively by one producer with reference to his goods or articles that, in the trade and to that branch of the purchasing public, the trade dress has come to mean that the article is his product." *Savant Homes*, 809 F.3d at 1148. Yet Forney's packaging has changed significantly over the 20 years described by Anderson. How then is a consumer supposed to have come to associate the packaging with Forney? Anderson cannot say that Forney has *exclusively* used its trade dress for 20 years, since it has not even *continuously* used the same trade

---

[5] Forney has objected on appeal and below to the relevance of the pictures, but at least two of them certainly pass muster: a label copyrighted in 2000 atop a grinding wheel manufactured in Maryland and a label for a cutting wheel copyrighted in 2006 by a Massachusetts manufacturer.

dress for 20 years.  Critically, Anderson's affidavit cannot fairly be read to say that no other competitor has used these four colors in those 20 years.  The affidavit is focused on the same vague description of Forney's trade dress that fails the inherently-distinctive test.  For this reason, his statement of exclusive use is insufficient to survive summary judgment.

Because Forney points to no other evidence that would permit a rational fact-finder to hold that its trade dress has acquired secondary meaning, we agree with the district court that KDAR was entitled to summary judgment.

## III. CONCLUSION

We AFFIRM the district court's judgment.

27