**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CRAFT SMITH, LLC, a California limited
liability company,

      Plaintiff Counterclaim Defendant -
      Appellee,

v.

EC DESIGN, LLC, a California limited
liability company,

      Defendant Counterclaimant -
      Appellant,

and

MICHAELS STORES, INC., a Delaware
corporation,

      Counterclaim Defendant - Appellee.

No. 19-4087

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:16-CV-01235-DB)**
_____

Juliette P. White (Kristine M. Johnson and Alan S. Mouritsen with her on the briefs), of
Parsons Behle & Latimer, Salt Lake City, Utah, for Defendant Counterclaimant-
Appellant.

R. Parrish Freeman (Charles J. Veverka and Daniel R. Barber with him on the brief), of
Maschoff Brennan P.L.L.C., Park City, Utah, for Plaintiff Counterclaim Defendants-
Appellees.

_____

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

Since 2007, EC Design, LLC, has been selling its popular personal organizer, the LifePlanner. In 2015, Craft Smith, Inc., wanting to enter the personal-organizer market, reached out to EC Design about a possible collaboration. Failing to join forces with EC Design, Craft Smith, with input from Michaels Stores, Inc., designed and developed a personal organizer to sell in Michaels stores, leading to this action in Utah federal district court. EC Design has asserted that the Craft Smith and Michaels product infringes on the LifePlanner's registered compilation copyright and unregistered trade dress. The district court disagreed, granting summary judgment in favor of Craft Smith and Michaels (collectively, the Appellees) on both issues. On the copyright issue, the district court concluded that EC Design does not own a valid copyright in its asserted LifePlanner compilation. Though we disagree with how the court framed this issue, we affirm because no reasonable juror could conclude that the allegedly infringing aspects of Appellees' organizer are substantially similar to the protected expression in the LifePlanner compilation. On trade dress, the district court held that EC Design had failed to create a genuine issue of material fact over whether the LifePlanner's trade dress had acquired secondary meaning. We agree.

Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's grant of summary judgment in favor of Appellees on both claims.

**BACKGROUND**

**I.      EC Design's LifePlanner**

Erin Condren, EC Design's founder, designed the LifePlanner personal organizer to help users better plan their lives. To do so, the LifePlanner provides users with weekly and monthly calendars, which are color-coded and laid out helpfully. In addition to the calendars, the LifePlanner has colorful artwork, spaces for the user to write notes, inspirational quotations, and various other textual elements, all of which are interspersed throughout the entire planner. All these features are bound together by a single metal coil and enclosed between plastic-laminated front and back covers. And every year, users can select a LifePlanner to their liking from one of EC Design's many color/art options.

The LifePlanner contains three labeled sections—introductory, monthly, and notes.[1] The introductory section comprises a notes page, an ownership page, and a two-page spread of monthly thumbnail calendars. After the thumbnail calendars comes another two-page spread containing "an inspirational statement spanning the top of both pages" and six different-colored boxes on each page. App. vol. 18 at 4784. The introductory section ends with a lined page for notes. The monthly section follows. It contains color-coordinated tabs for each month, inspirational quotations to start each month, monthly calendars spread over two pages (with space on one side for notes), weekly calendars (horizontal or vertical layout), and a notes page. The

---

[1] This discussion refers specifically to the 2015/2016 LifePlanner—the version EC Design asserts Appellees infringed.

LifePlanner concludes with the notes section, which is signaled by a different color from the previous months and is labeled "NOTES." *Id.* at 4792–93. Several lined, graphical, and blank pages follow, along with a two-page spread of the next year's calendar, with rectangular boxes at the bottom for notes. The notes section concludes with several pages of stickers, a cutaway folder, and a pocket to place things.

Though this overall layout has stayed relatively constant, each passing year brings a variety of changes, distinguishing each year's LifePlanner from previous versions. Some changes occur every year—new text/artwork and updated calendars. Additional changes are made occasionally to the organizer's fundamental layout and look. These new offerings often reflect customer surveys, for instance, 2015's horizontal weekly calendar layout and hardbound-cover version.

Through the years, EC Design has registered trademarks in "LifePlanner," "Erin Condren," and the asterisk symbols adorning all its products. For the LifePlanner specifically, EC Design has registered three copyrights in the 2016/2017 version.[2] Only one of those registrations relates to this appeal: U.S. Registration No. VA 2-072-725 ('725 Registration), which ties to the "2016/2017 Vertical LifePlanner

---

[2] In this appeal, we assume that the registered 2016/2017 LifePlanner is a derivative work of the unregistered 2015/2016 LifePlanner, meaning that EC Design has satisfied the registration requirement—a statutory prerequisite for bringing a copyright-infringement action. *See* 17 U.S.C. § 411(a); *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 886 (2019). Because we affirm, we do not consider Appellees' alternative basis for affirming, which argues that EC Design failed *Fourth Estate*'s registration requirement by not registering the 2015/2016 LifePlanners.

Compilation."[3] App. vol. 16 at 4214. This registration covers "2-D artwork, compilation of introductory and section phrases, graphics" and excludes "[c]alendar arrangement and calendar text." *Id.*

## II. Craft Smith Enters the Personal-Organizer Market

In October 2015, Craft Smith took steps towards entering the personal-planner market.[4] At that time, Craft Smith reached out to Michaels—Craft Smith's biggest customer—about creating a new spiral-bound organizer that would be "like . . . the current Erin Condren Life Planner."[5] App. vol. 32 at 8448, 8512. As this comment

---

[3] The other two registrations—the "LifePlanner Horizontal Layout 2016/2017," U.S. Registration No. VA 2-024-598 and the "LifePlanner Vertical Layout 2016/2017," U.S. Registration No. VA 2-024-599—cover "2-D artwork, Text [cover/title page artwork; additional text & artwork throughout calendar]." App. vol. 14 at 3757 (Horizontal Layout); App. vol. 15 at 3979 (Vertical Layout). But these registrations exclude "2-D artwork, Text [functional elements; calendar elements; title page text]." App. vol. 14 at 3757 (Horizontal Layout); App. vol. 15 at 3979 (Vertical Layout). Notably, though the title of each registration contains the word "layout," these registrations do not cover the LifePlanner's layout. *See* App. vol. 14 at 3757; App. vol. 15 at 3979.

[4] Earlier in 2015, Craft Smith and EC Design discussed collaborating on an organizer but failed to reach a deal. In addition, in July 2016, EC Design and Michaels began discussions about selling the LifePlanner at Michaels. But this too ended without a deal. EC Design asserts that its discussions with both Appellees allowed them to become "highly familiar" with the LifePlanner to "intentionally copy" it. App. vol. 1 at 43.

[5] Per the parties' request, volumes 31 to 39 of the appendix were filed under seal, along with the parties' opening and response briefs. We respect this request. But for sealed material already made public (*i.e.*, by appearing in the published district court order), we identify it as needed in this opinion. *See Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 905 (10th Cir. 2017) (denying a motion to seal after the parties agreed that the "district court's summary judgment order may now be unsealed, even though the order describes and even quotes in it much of the information [the Appellant] now seeks to keep under seal"). For example, EC Design has redacted all

5

reflects, Craft Smith sought to emulate the LifePlanner with its own product. For example, it used a LifePlanner sample to obtain pricing estimates from the manufacturer. As a result, the manufacturer's quote to Craft Smith was based on the LifePlanner's "size," "quality of spiral," and "laminated type cover."[6] *Id.* at 8508, 8512 (noting that the manufacturer's quote was "based on everything you see in the EC planner"). Further, Craft Smith designed its organizer with the same "pagination and sheet counts" as the LifePlanner. *Id.* at 8508.

By April 2016, Michaels agreed to sell Craft Smith's new organizer in its stores—called the Recollections Planner. Soon thereafter, Michaels asked Craft Smith to compare the Recollections Planner with the LifePlanner to ensure that they were "not too similar." App. vol. 32 at 8600. In particular, Michaels sought assurance from Craft Smith that the organizers had different artwork and quotations. Craft Smith satisfied itself and Michaels that the artwork and quotations sufficiently differed from EC Design's, so, according to EC Design, the review led to no changes. And in October 2016, the Recollections Planner went on sale at Michaels.

---

the quotations that appear in this paragraph and the next. But this information appears in the district court's order, which is public. *See Craft Smith, LLC v. EC Design, LLC*, 388 F. Supp. 1385, 1393–94 (D. Utah 2019). Moreover, the district court's order is available in volume 30 of the appendix, which is not sealed.

[6] At a deposition, a Craft Smith employee testified that she did not remember what brand of organizer was used as a sample to obtain the quote, saying only that Craft Smith might have used a LifePlanner or a different brand's organizer. This would be a question of material fact for the jury. For purposes of summary judgment, we assume Craft Smith used a LifePlanner.

6

### III.    Procedural Background

On November 29, 2016, soon after the Recollections Planner went on sale, EC Design notified Craft Smith and Michaels that the Recollections Planner infringed the LifePlanner's copyright and trade dress. In response, Craft Smith sought a declaratory judgment in Utah federal district court that it had infringed neither. EC Design counterclaimed, joining Michaels to the suit and asserting copyright and trade-dress infringement claims, along with related state-law claims.[7] After discovery, both sides filed motions for summary judgment on the copyright and trade-dress claims. The district court granted Appellees' motion on the copyright and trade-dress claims, denied EC Design's motion, and declined to exercise supplemental jurisdiction over EC Design's state-law claims after disposing of the federal claims. EC Design timely appealed, challenging the district court's grant of summary judgment against its copyright and trade-dress claims.

### DISCUSSION

We review de novo a district court's grant of summary judgment, using "the same standard applied by the district court." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002) (citation omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We view

---

[7] EC Design first filed its own federal complaint in the Central District of California. But the proper venue was the District of Utah, leading EC Design to assert its claims against Craft Smith and Michaels as counterclaims in the Utah case.

all facts and evidence in the light most favorable to the party opposing summary judgment." *Blehm v. Jacobs*, 702 F.3d 1193, 1199 (10th Cir. 2012) (alteration omitted) (internal quotation marks and citation omitted).

## I.      Copyright Infringement

Copyright infringement requires that the plaintiff prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Id.* (quoting *Feist Publ'ns Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)) (internal quotation marks omitted); *see also Enter. Mgmt. Ltd., Inc. v. Warrick*, 717 F.3d 1112, 1117 (10th Cir. 2013) ("There are two elements to a copyright infringement claim; a plaintiff must show both ownership of a valid copyright, and copying of protectable constituent elements of the work." (citations omitted)). This appeal concerns both elements.

We hold that though EC Design owns a valid copyright in the LifePlanner compilation (element one), EC Design has failed to raise a genuine issue of material fact concerning the required substantial similarity between the LifePlanner compilation's protected expression and Appellees' allegedly infringing organizer (element two). Thus, we affirm the district court's grant of summary judgment.

### A.      Element One: Valid Copyright

To meet the first element of a copyright-infringement claim, a plaintiff must demonstrate ownership of a valid copyright in the allegedly infringed work. *See Blehm*, 702 F.3d at 1199; 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01[A] (2020) [hereinafter *Nimmer on Copyright*]. Often, a party

8

accomplishes this by producing a certificate of registration from the Copyright Office. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 942 (10th Cir. 2002) (finding the first element satisfied by a "federally registered copyright" in the accused work); *see also* 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration . . . shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.").

In this case, EC Design presented the '725 Registration certificate to the district court. The district court reviewed this certificate and concluded that "because EC's asserted compilation seeks much broader protection than the scope outlined on the 2016-2017 LifePlanner registration certificate ['725 Registration]," the certificate did not satisfy element one. App. vol. 30 at 8011. But in reaching this conclusion, the district court misapplied copyright infringement's first element, which requires only the existence of a valid copyright in the allegedly infringed compilation work as a whole. *See, e.g.*, *Feist*, 499 U.S. at 361 ("The first element is not at issue here; [plaintiff]'s directory, considered as a whole, is subject to a valid copyright because it contains some foreword text, as well as original material in its yellow pages advertisements." (citation omitted)). To see why this is so, we look to *Feist*, which illustrates this principle.

In *Feist*, the defendant copied portions of the plaintiff's white-pages directory verbatim, including fake listings inserted to detect copying. *Id.* at 343–44. In response, the plaintiff sued for infringement of its compilation copyright in the directory. *Id.* at 344. The Supreme Court granted certiorari to decide "whether the

9

copyright in [plaintiff]'s directory protects the names, towns, and telephone numbers copied by [defendant]." *Id.* But before reaching this issue, the Court concluded that the first element of copyright infringement was met, because the plaintiff had produced its copyright registration and the defendant conceded that the work "as a whole" was original. *Id.* at 361. And for a compilation, a valid copyright exists if the work "as a whole" exhibits "a minimal degree of creativity."[8] *Id.* at 348, 361; *see also* 17 U.S.C. § 103(a) (extending copyright protection to "compilations"); *id.* § 101 (requiring that a compilation's originality be judged by looking to the "work as a whole"); *Nimmer on Copyright* § 13.01[A] n.5.3 (noting that *Feist* found element one satisfied because "the plaintiff's work as a whole was subject to copyright protection," which led the Court to consider "the scope of prohibited copying"— element two (citing 499 U.S. at 361)). So with element one satisfied, the *Feist* Court turned to the real dispute: whether the copying alleged by the plaintiff was prohibited by copyright law—element two.[9] *See* 499 U.S. at 361–64; *see also TransWestern*

---

[8] In Discussion Section I.B.1, we explain what is required for a compilation to obtain copyright protection. We do so there (rather than here) because both EC Design and Appellees agree that a valid copyright exists in the LifePlanner compilation, which is all that element one requires. But the parties disagree over the scope of that copyright. The scope of protection a compilation copyright receives is informed by determining which aspects of the LifePlanner compilation render it copyrightable, making the inquiry relevant to element two.

[9] In fact, most cases concede element one, leaving the dispute over the scope of protection afforded by the valid copyright. *See, e.g.*, *Feist*, 499 U.S. at 361 ("The first element is not at issue here[.]"); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1138 (10th Cir. 2016) ("The parties do not dispute that Savant owns a valid copyright . . . ."); *Blehm*, 702 F.3d at 1199 (10th Cir. 2012) ("Life is Good does not

10

*Pub. Co. v. Multimedia Mktg. Assocs.*, 133 F.3d 773, 775 (10th Cir. 1998) ("The second element requires proof that defendants copied plaintiff's work and that the elements copied were protected." (citing *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1284 (10th Cir. 1996))).

Appellees agree that EC Design possesses a valid compilation copyright in the LifePlanner.[10] *See* Resp. Br. 32 ("It is important to understand that the district court did not invalidate EC's copyright registrations, nor did it declare that nothing about the LifePlanner could be protectable subject matter under the copyright laws. There is plenty that is protectable."). And because element one concerns only the existence of a valid copyright in the allegedly infringed work, we conclude it is satisfied. Of course, this does not mean that EC Design wins; rather, it just takes us to the next step, that is, examining the scope of this valid copyright. "The mere fact that a work is copyrighted does not mean that every element of the work may be protected."[11] *Feist*, 499 U.S. at 348. We resolve this issue in element two, which we turn to now.

---

dispute that Mr. Blehm owns a valid copyright . . . ."); *TransWestern*, 133 F.3d at 775 ("Defendants do not seriously contest that plaintiff has a valid copyright . . . .").

[10] In concluding that EC has not satisfied element one of the copyright-infringement analysis, Craft Smith follows the district court's mistaken route.

[11] The district court also analyzed the copyrightability of EC Design's "asserted compilation" as part of element one and concluded that the compilation was not entitled to copyright protection. The district court erred by analyzing that question under element one, because, as explained, the question in element one is simply whether a valid copyright exists in the LifePlanner compilation as a whole. But the court's analysis, while improperly framed, helps resolve element two.

## B.      Element Two: Copying of Original Elements

The second element in a copyright-infringement action "consists of two components." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1138 (10th Cir. 2016). First, the plaintiff must demonstrate factual copying.[12] *Id.* Second, the plaintiff must show "substantial similarity between the allegedly infringing work and the elements of the copyrighted work that are legally protected." *Blehm*, 702 F.3d at 1199 (internal quotation marks and citation omitted) ("This second component . . . determines whether a defendant's factual copying constitutes actionable infringement." (citations omitted)); *see also Jacobsen*, 287 F.3d at 942 (considering whether "those elements that were copied were protected" (citation omitted)).

For the second component, "a court must determine (1) which elements of the copyrighted work are protectable, and (2) whether these elements are substantially similar to the accused work." *Savant Homes*, 809 F.3d at 1138 (citing *Blehm*, 702 F.3d at 1200). Summary judgment on this component is proper only "if the protectable expression in the copyrighted work and the allegedly infringing work is 'so dissimilar . . . that no reasonable jury could find for the plaintiff on the question of substantial similarity.'" *Blehm*, 702 F.3d at 1202–03 (omission in original) (quoting *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1297 (D.C. Cir. 2002))

---

[12] As mentioned *supra* note 6, EC Design contends that Appellees used the LifePlanner as a model for the Recollections Planner. Such evidence creates a genuine issue of material fact over factual copying. *See Nimmer on Copyright* § 13.01[B] ("us[ing] the plaintiff's [product] as a model, template, or inspiration" demonstrates factual copying).

(citing *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986); *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1330 (9th Cir. 1983)).

In this case, EC Design has asserted its compilation copyright in the LifePlanner. So we review this compilation, along with relevant copyright law, to "distill the protec[ted]" expression in the LifePlanner compilation. *Blehm*, 702 F.3d at 1200. And after identifying the protectable expression contained in the LifePlanner compilation, we consider whether any of that protected expression is "substantially similar" to the Recollections Planner.

### 1. Step one: Protectable Expression

"Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression[.]" 17 U.S.C. § 102(a). But "[i]n no case does copyright protection for an original work of authorship extend to any idea . . . illustrated . . . or embodied in such work." § 102(b); *see also Blehm*, 702 F.3d at 1200 ("[Section 102(b)] enshrines the 'fundamental tenet' that copyright 'protection extends only to the author's original expression and not to the ideas embodied in that expression.'" (quoting *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 836 (10th Cir. 1993)) (citing *Harper & Row Publ'rs Inc. v. Nation Enter.*, 417 U.S. 539, 547 (1985); *Rogers v. Koons*, 960 F.2d 301, 308 (2d. Cir. 1992))).

Of importance here, copyright protection extends to "compilations," § 103(a), which are "work[s] formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship," § 101. This definition

13

contains the following three criteria: "(1) the collection and assembly of pre-existing material, facts, or data; (2) the selection, coordination, or arrangement of those materials; and (3) the creation, by virtue of the particular selection, coordination, or arrangement, of an 'original' work of authorship." *Feist*, 499 U.S. at 357 (discussing § 101). The LifePlanner satisfies the first two criteria because (1) it is a "collection and assembly of preexisting material" and (2) it has been selected, coordinated, and arranged.

To satisfy the third criteria, the LifePlanner compilation's selection, coordination, and arrangement of preexisting material must be (1) original and (2) a work of authorship. An original work must be "independently created by the author . . . and . . . possess[] at least some minimal degree of creativity." *Savant Homes*, 809 F.3d at 1138–39 (quoting *Feist*, 499 U.S. at 345) (internal quotation marks omitted). In other words, "[t]he required level of creativity is extremely low[,]" such that "even a slight amount will suffice." *Id.* at 1139 (internal quotation marks omitted) (quoting *Feist*, 499 U.S. at 345). For compilations, the requisite originality comes from the "compiler['s]" "choices as to selection and arrangement, so long as they are made independently . . . and entail a minimum degree of creativity." *Feist*, 499 U.S. at 348.

In addition to originality, the compilation itself must be a work of authorship under § 102(a). *Feist*, 499 U.S. at 357–58 (requiring that compilations qualify as a § 102(a) "work of authorship"). Here, EC Design contends that the LifePlanner is both a "literary work," § 102(a)(1), and a "pictorial, graphic, or sculptural work,"

14

§ 102(a)(5). Opening Br. 35–37. In other words, EC Design contends that its "LifePlanner compilation is a literary work with graphic elements." *Id.* at 36. Thus, its compilation copyright will protect the original selection and arrangement of the literary and graphic components contained therein. We identify those components next to distill the protected expression of the LifePlanner compilation.

A § 102(a)(1) literary work is a "work[], other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, . . . in which they are embodied." § 101. In this case, EC Design argues that the LifePlanner compilation qualifies as a literary work because it contains "preexisting phrases, months, weeks, days, holidays, numbers, and other data and information." Reply Br. 8. We agree; the LifePlanner's original selection, coordination, and arrangement of phrases, inspirational quotations, holidays, and other numerical data qualify the LifePlanner compilation as a literary work. Thus, the LifePlanner compilation's protected expression includes the specific text selected, as it has been originally arranged throughout the LifePlanner.

Next, we look to whether the LifePlanner compilation's protectable expression includes the LifePlanner's graphic components. Section 102(a)(5) pictorial or graphic works are "two-dimensional . . . works of fine, graphic, and applied art." § 101.

> Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article . . . shall be considered a pictorial [or] graphic . . . work only if, and only to the extent that, such design incorporates pictorial [or] graphic . . .

15

features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

*Id.* A "useful article" has "an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." *Id.* If an item is a "useful article," we decide whether its pictorial or graphic features can be separated from it, by employing the following test:

> [A] feature incorporated into the design of a useful article is eligible for copyright protection only if the feature (1) can be perceived as a two- or three-dimensional work of art separate from the useful article and (2) would qualify as a protectable pictorial, graphic, or sculptural work— either on its own or fixed in some other tangible medium of expression— if it were imagined separately from the useful article into which it is incorporated.

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1007 (2017).

Here, EC Design contends that the LifePlanner's "banners, color schemes, and two-dimensional artwork and design" render the LifePlanner a work of authorship under § 102(a)(5). Reply Br. 5; *see also* Opening Br. 48 (referencing the LifePlanner's "2-D artwork and graphics" as those that qualify for copyright protection). We need not decide whether the LifePlanner is a useful article regarding these graphics, because, even if it were, the banners, two-dimensional artwork, and color schemes can easily be viewed "separate from" the LifePlanner as required by *Star Athletica*.[13] This renders those graphical components copyrightable elements of

---

[13] We question whether the calendar elements can be viewed "separate[ly] from" the LifePlanner. But because EC Design does not argue that those are part of the LifePlanner's work of authorship, we need not decide that. For similar reasons, this helps explain why we need not consider whether the LifePlanner is a useful article.

16

the overarching compilation. In fact, Appellees agree that the LifePlanner's two-dimensional "art is separable" and conclude that the art contained in the LifePlanner qualifies as a work of authorship (they contend this does not matter, because these components of the LifePlanner were not copied). Resp. Br. 36. Thus, the LifePlanner compilation's protectable expression includes—in addition to textual elements—its original selection and arrangement of the specific two-dimensional artwork and graphics contained therein.

Before moving to the substantial-similarity test, however, it is important to keep in mind what is not included in the LifePlanner's protectable expression. Because a compilation copyright arises from "the selection, coordination, and/or arrangement of specific content," its protectable expression is "limited to the selection, coordination, and/or arrangement of *that specific content*, and [does] not apply to the format and layout itself." U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 313.3(E) (3d ed. 2017) (emphasis added) [hereinafter *Compendium*].[14] To grant further protection would violate § 102(b)'s dictate that

---

[14] "[T]he Compendium is a non-binding administrative manual that at most merits [*Skidmore*] deference . . . ." *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1510 (2020) (referring to *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). Thus, we "follow it only to the extent it has the power to persuade." *Id.* (quoting *Skidmore*, 323 U.S. at 140) (internal quotation marks omitted). Here, we find section 313.3[E] persuasive, because of the statutory direction that copyright law extends not to ideas, but to expression. Granting copyright protection to the layout and format of a compilation would extend copyright to the ideas contained in methods of laying out or formatting information. Doing so would impermissibly expand the scope of such copyright law beyond the actual expression used (meaning, the specific content found in the work). And because a compilation's original expression comes from the selection, coordination, and arrangement of the specific content expressed, that

copyright law does not protect ideas. And because a compilation copyright protects the selection and arrangement of the specific content used (its expression), "[t]he protection available for a compilation is 'thin.'" *TransWestern*, 133 F.3d at 776 (quoting *Feist*, 499 U.S. at 349).

In sum, the LifePlanner's protectable expression consists of the selection, coordination, and arrangement of the specific literary and graphic components that make up the LifePlanner as a whole.[15]

### 2. Step two: Substantial Similarity

Having identified the LifePlanner compilation's protected expression, we now ask whether that expression is "substantially similar to the accused work." *Savant Homes*, 809 F.3d at 1140 (internal quotation marks omitted) (quoting *Blehm*, 702 F.3d at 1202). "Substantial similarity exists when 'the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's [protectable] expression by taking material of substance and value.'" *Id.* (alteration in original) (quoting *Blehm*, 702 F.3d at 1202). For compilations, "because the copyrightability of a factual compilation depends upon the originality in selection, coordination or arrangement of

---

copyright protection cannot extend to different content even if it was similarly coordinated and arranged. Doing so would protect an idea, rather than expression, something copyright law does not allow. *See* § 102(b).

[15] Our conclusion comports with the '725 Registration, which covers "2-D artwork, compilation of introductory and section phrases, graphics." App. vol. 16 at 4214.

18

the facts as a whole work, in an infringement action the court must compare the allegedly infringing work as a whole" when determining whether the two works are substantially similar.[16] *TransWestern*, 133 F.3d at 777 (internal quotation marks and citation omitted).

Here, EC Design argues that the following four bases demonstrate substantial similarity between the LifePlanner compilation and the Recollections Planner: First, EC Design argues that Appellees used "the same monthly and weekly calendar forms, with the same banners and notes sections, and arranged them in the same order[.]" Reply Br. 15. Second, EC Design points out that "Appellees arranged their infringing planner compilation into the same three sections: introductory, monthly, and notes, with the same number of pages in each section." *Id.* at 19 (footnote omitted). Third, EC Design argues that Appellees "selected the same number of sticker pages and arranged them in the same location in their planner." *Id.* And fourth, EC Design argues that the "two works have the same tab size and font." *Id.* From this, EC Design contends that a jury should resolve the question of whether the two works, when compared as a whole, are substantially similar. We disagree.

---

[16] For this reason, non-compilation cases that discuss "protected elements" of a copyright can mislead in the compilation context. A compilation copyright must be viewed "as a whole," not broken up into protected/unprotected elements. *Cf. Enter. Mgmt.*, 717 F.3d at 1119 (discussing element one) ("Any copyrightable work can be sliced into elements unworthy of copyright protection. . . . We must focus on whether [plaintiff] has selected, coordinated, and arranged the elements of her [work] in an original way." (internal quotation marks and citations omitted)).

In listing these similarities, EC Design does not claim that Appellees copied any of its planner's artwork or text—the two most significant portions of protected expression in the LifePlanner compilation. In fact, EC Design does not even claim that Appellees employed similar artwork or similar text. Instead, EC Design claims that Appellees have adopted a similar format. But the format of the LifePlanner is not part of its protectable expression. Rather, EC Design's protectable expression, for example, is the selection of the quotations "make room for good things to begin" and "everything you now know was once unknown" and the quotations' arrangement on the pages immediately after the ownership page. App. vol. 18 at 4783 (capitalization removed).

Copyright law does not protect how EC Design has laid out its LifePlanner, which is an idea, not expression. *See* § 102(b); *Compendium* § 313.3(E). EC Design's original idea of arranging a colorful organizer full of quotations and art is not protectable by copyright. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any *idea . . . embodied* in such work." (emphasis added)). Instead, copyright protects the selection, coordination, and arrangement of the specific text and artwork found in the LifePlanner compilation. Thus, when Appellees used entirely different artwork and text, even if arranged similarly, it did not copy the LifePlanner's protected expression. These substantial differences eliminate the possibility that a reasonable juror could conclude that the protected elements of the LifePlanner are substantially similar to the Recollections

20

Planner.[17] *See TransWestern*, 133 F.3d at 777 (relying on the "many differences" between the compilation copyright and the accused work to affirm "the district court's finding of no infringement").[18]

Thus, because none of the alleged similarities in Appellees' Recollections Planner relate to the LifePlanner's protected expression, no reasonable juror could conclude that the two products are substantially similar, and we affirm the district court.[19]

## II. Trade Dress

Next, we consider EC Design's argument that the district court improperly took the issue of trade-dress infringement from the jury. Trade dress consists of a product's "overall image and appearance, and may include features such as size,

---

[17] Because we conclude that EC Design has failed to allege any similarities between the Recollections Planner and the protected expression in the LifePlanner, we do not decide whether the district court erred by applying a "supersubstantial similarity" test. We disagree with EC Design's argument that the district court also erred by focusing on differences between the products instead of their similarities. In identifying the dissimilarities between the planners, the district court has explained why no reasonable juror could find substantial similarity between the two planners after considering them as a whole.

[18] In addition to having different content, the two planners arrange their own content differently. For example, the arrangement of quotations throughout each organizer is different—for instance, EC Design includes quotations for every month of the year, while Appellees do so for half the months. This further supports the district court's decision granting summary judgment for Appellees.

[19] The district court reached this conclusion differently. By reviewing the asserted compilation for copyrightability in element one, the district court sought to determine whether the LifePlanner compilation's protected expression could have been infringed. While there may be something to say for the district court's approach, our precedent requires a different framework—the one we follow here.

21

shape, color or color combinations, texture, graphics, and even particular sales techniques." *Sally Beauty*, 304 F.3d at 977 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992)). In this case, EC Design has identified eleven factors that make up "the trade dress of the LifePlanner." Opening Br. 61–62. Among these factors are plastic-laminated front and back covers, coil-bound planner pages, colored themes throughout, and overall layout. In other words, the LifePlanner trade dress consists of the "combinations and the total image and overall look and feel" that the various pieces of the LifePlanner "impart upon the LifePlanner Products and in the minds of consumers." App. vol. 30 at 8024 (quoting EC Design's second amended complaint in the district court's order). In addition, the district court concluded that the LifePlanner possesses product-design trade dress, a conclusion EC Design does not challenge.

## A.    The Lanham Act

Section 43(a) of the Lanham Act allows an owner of unregistered trade dress to bring a claim "for the use by any person of 'any word, term, name, symbol, or device, or any combination thereof . . . which . . . is *likely to cause confusion* . . . as to the origin, sponsorship, or approval of his or her goods. . . .'" *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000) (omissions in original) (emphasis added) (quoting 15 U.S.C. § 1125(a)). By creating this private right of action, Congress has sought to "prevent[] deception and unfair competition." *Two Pesos*, 505 U.S. at 763, 773.

22

To succeed in its section 43(a) action, EC Design "must show: '(1) [Its] trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) [Its] trade dress is nonfunctional.'" *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1147 (10th Cir. 2016) (quoting *General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1200, 1227 (10th Cir. 2007)). The district court granted summary judgment for Appellees on the first requirement, which leaves distinctiveness as the sole issue on appeal. And because the LifePlanner has product-design trade dress, distinctiveness exists only if the trade dress has acquired secondary meaning. *See Wal-Mart*, 529 U.S. at 210–11.

This secondary meaning requirement reflects that for product-design trade dress, "consumer predisposition to equate the feature with the source does not exist." *Id.* at 213. "Consumers are aware of the reality that, almost invariably, even the most unusual of product designs . . . is intended not to identify the source, but to render the product itself more useful or more appealing." *Id.* So when a competitor copies a product's design, its purpose is not necessarily to confuse consumers, but to copy the aspects of that product that make it more functional. *Id.* In this way, product-design trade dress fundamentally differs from product-packaging trade dress, which can be inherently distinctive, because the very act of "encasing it in a distinctive packaging [serves] to identify the source of the product." *Id.* at 212. As a result, the Court requires "that, in an action for infringement of unregistered trade dress under

23

[section] 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." *Id.* at 216.

## B. Secondary Meaning

Secondary meaning requires that the trade dress "have been used so long and so exclusively by one producer with reference to his goods or articles that, in the trade and to that branch of the purchasing public, the [trade dress] has come to mean that the article is his product." *Savant Homes*, 809 F.3d at 1148 (alteration in original) (internal quotation marks omitted) (quoting *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1154 (10th Cir. 2013)). In other words, secondary meaning exists when the trade dress's "*primary significance* in the minds of potential consumers is no longer as an indicator of something about the product itself but as an indicator of its source or brand." *Vornado Air Circulation Sys., Inc v. Duracraft Corp.*, 58 F.3d 1498, 1502 (10th Cir. 1995) (emphasis added). This means that the "ultimate inquiry is whether in the consumer's mind the mark denotes a single thing coming from a single source." *Sally Beauty*, 304 F.3d at 978 (quoting *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995)). "Whether a trade dress has acquired secondary meaning is a question of fact and thus *generally* should not be decided at the summary judgment stage." *Id.* (emphasis added) (citation omitted).

To show secondary meaning, parties can present both "direct evidence, such as consumer surveys or testimony from consumers, and circumstantial evidence." *Water Pik, Inc.*, 726 F.3d at 1154 (internal quotation marks and citation omitted). In this case, EC Design has provided only circumstantial evidence, which can include:

24

> (1) the length and manner of the trade dress's use; (2) the nature and extent of advertising and promotion of the trade dress; (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the trade dress and a particular product or venture; (4) actual consumer confusion; (5) proof of intentional copying; or (6) evidence of sales volume. Sales volume, however, only suggests secondary meaning when presented in conjunction with other evidence; standing alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification.

*Savant Homes*, 809 F.3d at 1148 (internal quotation marks, alterations, and citations omitted). EC Design has presented five types of circumstantial evidence listed in *Savant Homes*—all but category four, "actual consumer confusion"—along with evidence of media attention and third-party recognition. It contends that this evidence should render secondary meaning a jury question. Going further, EC Design also argues that its evidence of sales volume and intentional copying alone justify sending this question to a jury given our court's decision in *Sally Beauty*. We evaluate both arguments below, but before doing so, we start with EC Design's circumstantial evidence.

### 1.     EC Design's circumstantial evidence of secondary meaning

Addressing the first category of *Savant Homes* evidence, EC Design points to what it deems its long-term, exclusive use of the LifePlanner trade dress. It concedes that while the asserted "trade dress was first presented in its entirety in the summer of 2015," it "has used many core elements of the LifePlanner trade dress for much longer." Opening Br. 69. For example, EC Design references its use of colorful themes, a customizable cover, sticker pages, and "a coiled binding" in the LifePlanner since 2007. Opening Br. 69 (citing App. vol. 35 at 9205). EC Design also

25

contends that it began using colorful organizer tabs in 2011. In addition, EC Design contends that this use was exclusive, despite some of its competitors using similar features both before and at the time Appellees first introduced their own organizer to the market.

For the second and third categories, EC Design points to $600,000 spent on advertising the LifePlanner (with references to its trade dress) "through social media, email, and third-party bloggers." Opening Br. 71 (citing App. vol. 2 at 349). For example, EC Design paid for social-media posts by influencers, which favorably reference or picture the LifePlanner. Some posts highlight quotations contained in the LifePlanner, while others focus on its color or calendar layout. And yet other posts discuss topics other than the LifePlanner, such as the Super Bowl or Christmas decorating—showing, perhaps, how the LifePlanner can be used. Further, EC Design has paid for YouTube ads that show people enjoying a colorful LifePlanner. And finally, EC Design has sent newsletters to highlight annual updates to the LifePlanner. These e-mailings, for example, focus on new color options for the covers, different calendar layouts, and various other ways in which a user can customize the LifePlanner.

For the fifth category, EC Design points to "evidence that Craft Smith intentionally copied the design of the LifePlanner in its creation of the Recollections Planner." Opening Br. 63. This copying evidence shows that Craft Smith sent the LifePlanner to its manufacturer, asking for "everything [to be] the same." App. vol. 32 at 8508. In addition, Craft Smith told its manufacturer that the Recollections

26

Planner should "feel like [the] overall weight of [the LifePlanner] sample." *Id.* at 8564.

For the sixth category, EC Design presents evidence of the LifePlanner's significant sales. For example, EC Design has sold over 1,549,770 LifePlanners since 2009. And gross revenue from those sales has "total[ed] over sixty five million dollars[.]" App. vol. 2 at 239.

Finally, in addition to evidence fitting the categories listed in *Savant Homes*, EC Design points to third-party reviews of the Recollections Planner, which have deemed it a "knockoff" or "dupe" of the LifePlanner. Opening Br. 74. These reviews note similarities between the two planners and contend that "the[ Appellees] hacked [their planner] from Erin Condren." App. vol. 25 at 6775. EC Design also directs us to attention the LifePlanner received from third parties and the media. For example, Fox Business wrote a story documenting EC Design's growing success. And in another article, Buzzfeed recommended that its readers "organise [sic] [their] li[ves] with an Erin Condren life planner." App. vol. 21 at 5883.

We must decide whether this evidence creates a genuine issue of material fact regarding secondary meaning. But before considering the entirety of EC Design's circumstantial evidence, we consider EC Design's argument that our court's decision in *Sally Beauty* renders the question of secondary meaning one for the jury on the strength of its evidence of significant sales and intentional copying alone.

27

## 2. *Sally Beauty*: Significant sales and intentional copying

In *Sally Beauty*, our court held that evidence of significant sales volume and intentional copying created a genuine issue of material fact regarding whether the plaintiff's product-packaging trade dress had developed secondary meaning. 304 F.3d at 970, 977. Based on this holding, EC Design argues that its own evidence of substantial sales and intentional copying renders the issue of secondary meaning in the LifePlanner's product-design trade dress a jury question. But for the reasons below, we reject this argument. For product-design trade dress, we decline to adopt a per se rule that evidence of intentional copying and significant sales alone render secondary meaning a jury question.[20]

*Sally Beauty* concerned whether product packaging for the plaintiff's hair-care line was distinctive, requiring our court to decide whether the product packaging was inherently distinctive or had become distinctive due to secondary meaning. *See id.* at 977. We concluded that "a genuine issue of material fact exists whether [the] trade dress [was] descriptive."[21] *Id.* And because a "*descriptive* trade dress . . . is not entitled to trade dress protection unless it has acquired secondary meaning in the

---

[20] For reasons discussed *infra* Discussion Section II.B.3, the principles guiding the decision in *Sally Beauty* do apply in the product-design context.

[21] "[I]nherent distinctiveness of a trade dress is categorized along the generic-descriptive-suggestive-arbitrary-fanciful spectrum." *Sally Beauty*, 304 F.3d at 977 (citing *Two Pesos*, 505 U.S. at 768). And descriptiveness is a form of distinctiveness for product-packaging trade dress. *Id.* ("A trade dress is descriptive if it conveys an immediate idea of the ingredients, qualities or characteristics of the goods." (internal quotation marks and citation omitted)).

marketplace," we had to decide whether the hair-care line's trade dress had developed secondary meaning. *Id.* (emphasis added).

In analyzing secondary meaning, we started with the principle that oftentimes a jury should decide the secondary-meaning issue. *See id.* at 978. This influenced our view of "the ultimate question" for trade-dress infringement: "whether in the consumer's mind the mark denotes a single thing coming from a single source." *Id.* (internal quotation marks and citation omitted). With that, we reviewed the three categories of evidence presented by the plaintiff to show secondary meaning: (1) "a history of successful sales," (2) "intentional copying," and (3) "long use of the [relevant] trade dress." *Id.*

We began by noting that "[s]tanding alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification." *Id.* (citation omitted). In other words, circumstantial evidence that can easily be explained by "factors other than source identification" was not enough to create a genuine issue of material fact on secondary meaning. *See id.* For example, a product might enjoy high sales because the product itself is desirable—not because of any reason related to its source. Thus, we required further evidence to show that the product-packaging trade dress had developed secondary meaning. *Id.* And in *Sally Beauty*, this evidence came from the defendant's intentional copying of the plaintiff's product packaging. *Id.* This evidence, combined with significant sales, created "a

genuine issue of material fact" on whether the plaintiff's product-packaging trade dress had developed secondary meaning.[22] *Id.*

But why did intentionally copying a package's design, along with evidence of significant sales, create an issue of material fact regarding "whether in the consumer's mind the [trade dress] denotes a single thing coming from a single source[?]" *Id.* at 977 (internal quotation marks and citation omitted). To answer this question, we consider what intentionally copying packaging shows that sales do not. As we noted in *Sally Beauty*, sales volume can be explained by any number of factors unrelated to the product's source. *Id.* at 978. And because trade-dress protection exists to prevent deception, we required some evidence that the trade dress infringement caused deception. For product-packaging trade dress, such deception could be shown by a defendant's intentional copying, because the "very purpose" of distinctive product packaging is to identify the source. *Wal-Mart*, 529 U.S. at 212 ("[T]he very purpose . . . [of] encasing [a product] in a distinctive packaging . . . is most often to identify the source of the product."). So, when the defendant in *Sally Beauty* copied the appearance of the plaintiff's packaging, the defendant took something intimately tied to the plaintiff's product as a source identifier, not something that had to do with the product itself. *See* 304 F.3d at 977–78.

---

[22] In a footnote, we discounted Sally Beauty's evidence of long-term use, concluding that it provided "no evidence below or on appeal that its use of trade dress was substantially exclusive." *Sally Beauty*, 304 F.3d at 978 n.4 (citing *J.M. Huber Corp. v. Lowery Wellheads, Inc.*, 778 F.2d 1467, 1470 (10th Cir. 1985)).

But these considerations do not hold when the relevant trade dress is for product design, as it is here. Because unlike a product's packaging, a product's design often goes directly to its function. *See Wal-Mart*, 529 U.S. at 213 ("Consumers are aware of the reality that, almost invariably, even the most unusual of product designs . . . is intended not to identify the source, but to render the product itself more useful or more appealing."). So, when a competitor copies a design, it may have done so for any number of reasons unrelated to deception—in fact, as recognized by the Supreme Court, most often designs are copied "to render the product itself more useful or more appealing." *Id.* (citation omitted).

This is true here. EC Design's evidence of intentional copying may be explained by "factors other than source identification." *Sally Beauty*, 304 F.3d at 978 (citation omitted). For example, by choosing a similar calendar layout or size for their planner, the Appellees likely did so to take advantage of an already popular layout and size.[23] But this relates to the product's functionality, rather than its source. Further, Appellees used different cover art and cover types, and did not use anything like the registered trademark symbols employed on the cover of all EC Design LifePlanners.

---

[23] EC Design argues that by reaching similar conclusions based on the evidence, the district court inserted itself in the rightful place of the jury. We disagree. The district court simply explained why the proffered evidence was not related primarily to source identification. Our court did the same in *Sally Beauty*, when it rejected evidence of sales as insufficient to show secondary meaning because it "*could* be related to factors other than source identification." 304 F.3d at 978 (emphasis added) (citation omitted).

Thus, we conclude that EC Design's evidence of significant sales and intentional copying fail to create a genuine issue of material fact regarding the LifePlanner trade dress's secondary meaning. Likewise, we decline to extend *Sally Beauty*'s holding to the product-design trade-dress context. Now, mindful of the distinctions between product-design trade dress and product-packaging trade dress, we turn to EC Design's remaining circumstantial evidence—advertising, consumer confusion, and length of use.

### 3. EC Design's remaining circumstantial evidence

Though secondary meaning is oftentimes a question for the jury, it only becomes so if the plaintiff's evidence creates a genuine issue of material fact regarding whether the relevant trade dress has "the primary significance of . . . identify[ing] the source of the product rather than the product itself." *Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1253 (10th Cir. 2016) (internal quotation marks and citation omitted). As explained in our discussion of *Sally Beauty*, this means that the relevant circumstantial evidence must create a fact question whether trade dress serves primarily as a source identifier in consumers' minds. 304 F.3d at 977–78 (concluding that for product-packaging trade dress, this can be done with proof of intentional copying).

For product-design trade dress, this task can be difficult, because "even the most unusual of product designs" often exists "not to identify the source, but to render the product itself more useful or more appealing." *Wal-Mart*, 529 U.S. at 206, 213. Thus, merely providing evidence of the category suggested in *Savant Homes* is

32

not enough to create a genuine issue of material fact regarding secondary meaning for product-design trade dress. Instead, to survive a motion for summary judgment, the plaintiff must offer evidence creating a genuine issue of material fact that the trade dress serves primarily as a source identifier.[24] *See Sally Beauty*, 304 F.3d 977–78. Only one piece of circumstantial evidence is necessary to create a genuine issue of material fact that the trade dress serves as a source identifier, if combined with other circumstantial evidence—like the intentional copying in *Sally Beauty* when combined with sales. But in this case, all of EC Design's proffered evidence "could be related to factors other than source identification." *Id.* at 978 (citation omitted).

To start, EC Design contends that its length-of-use evidence creates a jury question over whether the LifePlanner's trade dress has developed secondary meaning. But for this to support secondary meaning, the trade dress must "have been used so long and so *exclusively* by one producer with reference to [its] goods that it has acquired [secondary meaning]." *Sally Beauty*, 304 F.3d at 978 n.4 (internal quotation marks omitted) (quoting *J.M. Huber Corp. v. Lowery Wellheads, Inc.*, 778 F.2d 1467, 1470 (10th Cir. 1985)). And here, the asserted LifePlanner trade dress has existed only since 2015. Given that EC Design asserts that the 2017 Recollections Planner (designed throughout 2016) infringes the LifePlanner's trade dress, we

---

[24] Our precedent contradicts EC Design's suggestion in its briefing that secondary meaning is always a jury question. *See Savant Homes*, 809 F.3d at 1148–49 (affirming a grant of summary judgment that held the product had not developed secondary meaning).

decline to find that trade dress only in use for a little over a year has "been used so long" as to acquire secondary meaning.

Further, after EC Design introduced the LifePlanner in 2007, it has routinely altered it significantly, including with new colors, artwork, covers, and layout. In fact, even within a same year, the LifePlanner's appearance has varied. We fail to see how a constantly updated product's design can develop secondary meaning through long-term use. Moreover, even if such use could be considered "so long," many aspects of the LifePlanner trade dress are not exclusive to EC Design. In fact, as the district court noted, when the Recollections Planner was designed in 2016, several other competitors were using a variety of the features constituting the LifePlanner trade dress, including LimeLife and Plum Paper, both of whose colorful planners used a single coil, colorful tabs, and laminated covers featuring artwork. Thus, EC Design's length-of-use evidence fails to create a genuine issue of material fact on secondary meaning.

Next, we look at EC Design's advertising evidence. Such advertising must speak directly to the trade dress or demonstrate an "effort[] to promote a conscious connection in the public's mind between [EC Design's trade dress] and its products." *Water Pik*, 726 F.3d at 1154. But "[a]dvertising that touts a product feature for its desirable qualities and not primarily as a way to distinguish the producer's brand is not only not evidence that the feature has acquired secondary meaning, it directly undermines such a finding." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662 (7th Cir. 1995). And here, EC Design's evidence shows that it used its

34

advertising to tout the LifePlanner's desirable features, not to "promote a conscious connection" between its trade dress and itself as the source. *Water Pik*, 726 F.3d at 1154. For example, the direct mailer that EC Design sent to consumers touted new design features that consumers would find "desirable." *Thomas & Betts*, 65 F.3d at 662. And many of the paid ads on YouTube and social media similarly highlighted the LifePlanner's usefulness in organizing one's life. And though much of EC Design's advertising "featur[ed] the LifePlanner product with recognizable elements of the trade dress," Opening Brief at 72, "[s]econdary meaning cannot usually be proven by advertising that merely pictures the claimed trade dress and does nothing to emphasize it or call attention to it[,]" *Forney*, 835 F.3d at 1254 (citation omitted). Thus, EC Design's advertising evidence does not create a genuine issue of material fact regarding secondary meaning, "because it could be related to factors other than source identification." *Sally Beauty*, 304 F.3d at 978 (citation omitted). In fact, the advertising directly undercuts EC Design's position, because it most often served to highlight design features, not to draw a connection in consumers' minds between the trade dress and its source.[25]

Finally, we conclude by considering EC Design's evidence that third parties commented that the Recollections Planner was a "knockoff" of the LifePlanner.

---

[25] EC Design's media-attention evidence fails for similar reasons. While the evidence provides a compelling look at the company's success, EC Design does not explain how this evidence demonstrates that the LifePlanner's trade dress primarily serves to "identify the source of the product rather than the product itself." *Forney Indus., Inc.*, 835 F.3d at 1253.

Opening Br. 74. As support for the relevance of this sort of evidence, EC Design cites *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619 (6th Cir. 2002). In *Abercrombie*, the Sixth Circuit allowed evidence that "consumers remark[ed] on the similarity of designs" to show "actual confusion by consumers." *Id.* at 639–40. Actual consumer confusion is the fourth category of *Savant Homes* evidence. Here, EC Design has not used this evidence to show actual consumer confusion, so its reliance on *Abercrombie* is misplaced.[26] And because EC Design fails to explain how this evidence shows that consumers view the LifePlanner's trade dress as a source identifier, we conclude that EC Design's evidence of third-party recognition does not create a genuine issue of material fact over secondary meaning.

In sum, we affirm the district court's grant of summary judgment in favor of Appellees, because EC Design has failed to create a genuine issue of material fact regarding the LifePlanner trade dress's secondary meaning with any of its proffered evidence.[27]

---

[26] In fact, *Abercrombie* undercuts EC Design's argument. Unlike the consumer-response evidence in *Abercrombie*, which concerned actual confusion, the consumer-response evidence here shows a lack of consumer confusion—the consumers readily distinguished between the two organizers.

[27] We recognize that this decision may make it more difficult to obtain trade-dress protection for a product's design. But this reflects the reality that trade-dress protection is an awkward fit for product design. *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001) (noting that the Supreme Court has "caution[ed] against misuse or overextension of trade dress," and that this is especially true for product-design trade dress, because "product design almost

36

## CONCLUSION

For the foregoing reasons, we affirm the district court's order granting summary judgment to Appellees on both infringement claims and, accordingly, dismiss this appeal.

---

invariably serves purposes other than source identification" (quoting *Wal-Mart*, 529 U.S. at 213)).